```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 08/02/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA ANNETTE KPAKA,

                Plaintiff,

          v.

CITY UNIVERSITY OF NEW YORK;
BOROUGH OF MANHATTAN
COMMUNITY COLLEGE; HOWARD
MELTZER; THADDEOUS RADELL; and
SIMON CARR,

                Defendants.

No. 14-CV-6021 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Linda Kpaka, proceeding *pro se*, brings this employment discrimination action against her former employer, Borough of Manhattan Community College ("BMCC"), the City University of New York ("CUNY"), and three BMCC professors. Plaintiff alleges racial and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, pay discrimination in violation of the Lily Ledbetter Fair Pay Act of 2009, and antitrust violations pursuant to the Sherman Antitrust Act of 1890. Defendants now move to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the basis that Plaintiff's Amended Complaint fails to state a claim.[1] For the reasons that follow, Defendants' motion to dismiss is granted and this case is dismissed with prejudice.

---

[1] This Court previously ruled that Plaintiff's employment discrimination claims against the three individual Defendants—Howard Meltzer, Thaddeous Radell, and Simon Carr—must be dismissed because "there is no individual liability under Title VII." Dkt. 25 at 6 (citing *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) ("Title VII does not impose liability on individuals.")). To the extent Plaintiff seeks to assert her Lily Ledbetter Act and Sherman Act claims against these individuals, they are analyzed below.

## BACKGROUND

I. **Facts**[2]

Plaintiff is an African American woman who was hired by BMCC in January 2011 to teach an art class as an adjunct lecturer. Am. Compl. at 4–6.[3] She taught at BMCC until January 2014. *Id.* at 47. Plaintiff alleges that before she was hired, Defendant Simon Carr, an associate professor, interviewed her and reviewed "all of [her] diplomas, certificates, and Visual Art portfolio from [her] Catalogue." *Id.* at 4. Plaintiff reproduced some of the works in her "Visual Art portfolio" in the Amended Complaint. *Id.* at 32–33. Plaintiff asserts that, after she started teaching at BMCC, Carr "acknowledged [her] hard work efforts[] and espoused a supportive working relationship through email communications." *Id.* at 7. Plaintiff also asserts that she received "an objective well-balanced assessment" of her performance in the classroom following a faculty observation by Sarah Haviland in May 2011. *Id.* at 19. Following another faculty classroom observation in 2012 by Pat Genova, Plaintiff received a "supportive" assessment of her work. *Id.* Plaintiff alleges that both Haviland and Genova are "Caucasian females" and notes that she received "favorable reports from other women in the Art Department." *Id.*

Plaintiff further alleges, however, that on two separate occasions Defendant Howard Meltzer, an associate professor and the chair of BMCC's Department of Music and Art, deprived her of opportunities at the school. First, Plaintiff alleges that in March 2012, Meltzer denied her a paid position to serve on a summer committee tasked with revising the curriculum plan of the Liberal Arts school at BMCC. *Id.* at 11. On March 14, 2012, Meltzer emailed a group asking for

---

[2] The facts are drawn from Plaintiff's Amended Complaint, its exhibits, and records from the Equal Employment Opportunity Commission, of which the Court may take judicial notice. *See, e.g., Roberti v. Schroder Inv. Mgmt. N. Am., Inc.*, No. 04-CV-2404 (LTS), 2006 WL 647718, at *3 (S.D.N.Y. Mar. 14, 2006) ("EEOC filings constitute . . . administrative records and may be properly judicially noticed.").

[3] For ease of reference, the Court will refer to the Amended Complaint by page number corresponding to the ECF case stamp at the top of each page.

2

"[a]ny takers" to "work over the summer for pay to serve on a committee to revise the Liberal Arts program to accommodate the 30-credit Common Core." *Id.* at 13–14. After Plaintiff indicated that she was interested in the opportunity, Meltzer responded and told her that "[f]or someone who is not full-time and hasn't been involved with advisement, the learning curve might be very steep." *Id.* at 15. Plaintiff alleges that although Meltzer "began exchanging extensive information" with her about the project, he "referred [the] position" to someone else on March 16, 2012. *Id.* at 11.

Second, Plaintiff alleges that in February 2013, Meltzer denied her a different paid position to serve as a member on a school hiring committee. *Id.* Around this time, Meltzer emailed a group seeking "[p]articipation in [a] (non-departmental) search committee." *Id.* at 17–18. In the email, Meltzer wrote that he was "supposed to come up with someone from the department who would be willing to serve on a search committee" for Higher Education Officers ("HEOs") who would be "hired to assist the departments with administrative tasks." *Id.* at 17. Meltzer added that he "th[ought] there w[ould] be more people coming forward than need to serve" and that "[i]f you always wanted to participate in a hiring process, this is your chance." *Id.* At the end of the email, Meltzer wrote his name as "Howard aka Tom Sawyer (have fun painting the fence…..)." *Id.*

On February 19, 2013 at 3:42 p.m., Plaintiff replied to Meltzer. *Id.* at 18. She wrote that she "would like to serve on the search committee" and that she "ha[d] administrative skills/knowledge that would assist the department if hired." *Id.* Six minutes later, at 3:48 p.m., Meltzer responded. *Id.* He wrote:

> I sent the memo to everyone, but the participation on the search committee is probably best left for a fulltime person. If nothing else, the Union frowns on having part-time faculty but [*sic*] in hours without being compensated.
> If you are interested in applying for the job, it should be posted on CUNYFirst. It would be a full-time position with benefits, but no classroom involvement. The salary should be in the mid $30K range according to the functional title.

3

*Id.*

Plaintiff also alleges that she subsequently received two unfair evaluations from male faculty members at BMCC. In April 2013, Defendant Thaddeus Radell, an assistant professor, observed Plaintiff's "Introduction to Painting" class. *Id.* at 25. Radell's observation report concluded that Plaintiff's teaching was "dissatisfactory and ineffectual." *Id.* at 27. Plaintiff contends that Radell's report was "disparaging" and contradicts the student evaluation reports from that semester, in which "[o]ver 60% of students agree that [Plaintiff's] presentation of course material was clear." *Id.* at 24.

Plaintiff alleges that, after the spring semester of 2013, Radell sought to prevent her from teaching at BMCC in the fall, "utilizing seniority of full time instructors as motive." *Id.* at 47. On August 28, 2013, Plaintiff sent Radell an email in which she said she was "agasped [*sic*] at the firing of my position . . . by you," but that she was nonetheless "under signed contract with BMCC for fall 2013." *Id.* at 50. Later that day, Radell replied to Plaintiff confirming that she would teach a class during the fall semester. *Id.* at 49.

On November 1, 2013, Carr observed one of Plaintiff's fall 2013 classes. *Id.* at 22. On November 20, 2013, Plaintiff met with Carr and Pat Genova, another professor, to discuss Carr's observations. *Id.* Genova's notes from that meeting detail the deficiencies that Carr found in Plaintiff's teaching—namely, that Plaintiff provided insufficient guidance and feedback to students—as well as Plaintiff's responses to Carr's critiques. *Id.* On December 13, 2013, Plaintiff wrote a "Post-Observation Conference Memorandum" in which she explained that she "found [herself] being defensive" at the meeting with Carr and Genova and that she thought Carr's criticism of her class was "subjectively partial." *Id.* at 21. Plaintiff alleges that the evaluations she received from Radell and Carr were appreciably worse than the two "ordinary reports" she

4

received from Haviland and Genova in 2011 and 2012, which "were not 'detrimental.'" *Id.* at 19. According to Plaintiff, Radell and Carr—unlike Haviland and Genova—took a "'men's club only' mindset to denounce [Plaintiff's] professional qualifications." *Id.* at 51.

After Plaintiff met with Carr and Genova—but before she wrote her Post-Observation Conference Memorandum—Plaintiff received a letter from Antonio Perez, the president of BMCC, "offer[ing her] re-employment as an Adjunct Lecturer in the Department of Music & Art at [BMCC] for the Spring 2014 semester." *Id.* at 46. The letter is dated November 26, 2013, and Plaintiff's signature accepting the offer is dated December 4, 2013. *Id.* The letter notes that the offer of employment is "subject to sufficiency of enrollment, financial availability and curriculum need." *Id.*

Plaintiff ultimately was not assigned a class to teach in spring 2014. She alleges that Defendants "did not honor [their] contractual agreement" and that she "was discharged for no other motive th[a]n race and gender." *Id.* at 3, 47.

## II. Procedural History

On September 3, 2013, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Mou Decl. Ex. 2. The EEOC issued Plaintiff a right to sue letter on June 18, 2014, *see* Mou Decl. Ex. 3, and Plaintiff commenced this action on July 16, 2014, *see* Dkt. 2. Defendants moved to dismiss, and the Court granted the motion without prejudice. *See* Dkt. 25. Plaintiff thereafter filed the Amended Complaint, which Defendants now move to dismiss. *See* Dkt. 26, 33. In response, Plaintiff filed a "Motion for Jury Trial," which the Court deems to be an opposition to Defendants' motion, and Defendants filed a reply. *See* Dkt. 40, 41.

5

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014).

"Where, as here, the complaint was filed *pro se*, it must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). "Even in a *pro se* case, however, ' . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). "Hence, though [courts] are obligated to draw the most favorable inferences that [plaintiff's] complaint supports, [they] cannot invent factual allegations that [plaintiff] has not pled." *Id.*

## DISCUSSION

Plaintiff seeks to bring claims for race and sex discrimination pursuant to Title VII, equal pay violations pursuant to the Lily Ledbetter Act, and antitrust violations pursuant to the Sherman Act. For the reasons that follow, all of Plaintiff's claims are dismissed.

## I. Title VII

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)). A plaintiff asserting a claim pursuant to Title VII accordingly must "allege two elements: (1) the employer discriminated against h[er] (2) because of h[er] race, color, religion, sex, or national origin." *Id.*

"As to the first element, an employer discriminates against a plaintiff by taking an adverse employment action against h[er]." *Id.* "An adverse employment action exists if an employee 'endures a materially adverse change in the terms and conditions of employment.'" *Shein v. N.Y.C. Dep't of Educ.*, No. 15-CV-4236 (DLC), 2016 WL 676458, at *4 (S.D.N.Y. Feb. 18, 2016) (quoting *Vega*, 801 F.3d at 85). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Vega*, 801 F.3d at 85 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "As to the second element, an action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Id.* "[A] plaintiff in a Title VII case need not allege 'but-for' causation." *Id.* at 86.

"Accordingly, to defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against h[er], and (2) h[er] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Id.* at 87. A plaintiff can allege the second element of a Title VII claim "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible

7

inference of discrimination." *Id.* (citing *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)).

Plaintiff alleges two distinct theories of Title VII liability in the Amended Complaint: (1) that Meltzer discriminated against her on the basis of race in refusing to appoint her to two BMCC committees; and (2) that BMCC terminated her after Radell and Carr gave her poor performance evaluations on the basis of race and sex. Each theory is discussed below.

### A.  BMCC Committees

Plaintiff alleges that in March 2012 she was denied the opportunity to serve on a committee to revise BMCC's liberal arts curriculum plan (the "Curriculum Committee") and that in February 2013 she was denied the opportunity to serve on a committee to hire new HEOs (the "Search Committee"). Reading the Amended Complaint liberally to allege these incidents constitute failures to promote her, neither allegation can form the basis of a plausible Title VII claim.

#### 1.  The Curriculum Committee

Defendants argue that the events related to the Curriculum Committee "are barred by [Title VII's] 300[-]day statute of limitations." Defs.' Br. at 3; *see also id.* at 13 n.5 ("Plaintiff's allegations related to the [Curriculum Committee] . . . are time-barred."). The Court agrees.

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 days or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" *Vega*, 801 F.3d at 78–79 (quoting 42 U.S.C. § 2000e–5(e)(1)). "In Title VII actions, a plaintiff may sue in federal court only after filing timely administrative charges with the EEOC and receiving a right-to-sue letter." *Hiralall v. Sentosacare, LLC*, No. 13-CV-4437 (GBD), 2016 WL 1126530, at *7 (S.D.N.Y. Mar. 18, 2016) (citing 42 U.S.C. § 2000e–5(f)(1); *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 562–63 (2d Cir. 2006)).

The Supreme Court has "made clear that the word 'practice' in this context refers to 'a discrete act or single occurrence,' and that 'a discrete retaliatory or discriminatory act occurred on the day that it happened.'" *Vega*, 801 F.3d at 79 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–11 (2002)). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. "[F]ailure to promote is considered a 'discrete act.'" *Brannon v. City of New York*, No. 09-CV-4335 (LTS), 2016 WL 270399, at *5 (S.D.N.Y. Jan. 21, 2016) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004)).

Under the continuing violation doctrine, however, "a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997). "[C]ourts in the Second Circuit have viewed continuing violation arguments with disfavor." *Hiralall*, 2016 WL 1126530, at *7 (quoting *Bernstein v. The MONY Grp., Inc.*, 228 F. Supp. 2d 415, 418 (S.D.N.Y. 2002)). "Essentially, the 'continuing violation' doctrine is only applicable when there is a specific 'policy or mechanism' of discrimination being committed by a defendant and 'multiple incidents of discrimination, *even similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.'" *De La Peña v. Metropolitan Life Ins. Co.*, 953 F. Supp. 2d 393, 407 (E.D.N.Y. 2013) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)).

Plaintiff did not file her EEOC charge within 300 days of Meltzer's decision to "refer[ the Curriculum Committee] position" to someone else. Am. Compl. at 11. Plaintiff filed her EEOC charge on September 3, 2013. Mou Decl. Ex. 2 at 1. Accordingly, any allegedly unlawful

9

employment practice occurring before November 7, 2012 is time-barred. Plaintiff's emails with Meltzer regarding the Curriculum Committee are dated March 14, 2012 through March 16, 2012, and Plaintiff alleges that Meltzer appointed someone other than her to the Curriculum Committee on March 16, 2012. Am. Compl. at 11, 13–16. This claim thus runs afoul of Title VII's statute of limitations. *See Brannon*, 2016 WL 270399, at *5 (dismissing claim that "clearly f[ell] well outside the bounds of the 300 day statute of limitations for filing an EEOC charge").

Nor does the continuing violation doctrine apply. The Amended Complaint identifies just two instances in which Plaintiff believes she was denied opportunities for advancement, and they occurred almost one year apart. *See* Am. Compl. at 11. Even if read in conjunction with all the other allegations in the Amended Complaint, moreover, these events are insufficient to establish a discriminatory policy necessary for the continuing violation doctrine to apply. *See De la Peña*, 953 F. Supp. 2d at 407 ("Merely alleging that [plaintiff] was the only Filipino in the office, and noting a series of events that appear to be unrelated, does not state a claim based on a discriminatory policy or mechanism."). Plaintiff's claims regarding the Curriculum Committee are therefore dismissed.

### 2. The Search Committee

Meltzer emailed Plaintiff regarding the Search Committee in February 2013, less than 300 days before she filed her EEOC charge and thus within the applicable statute of limitations. *See* Am. Compl. at 11, 17–18. Defendants argue that Meltzer's decision not to appoint Plaintiff to the Search Committee nonetheless does not form the basis of a Title VII claim because the Amended Complaint "fails to allege how anything in [Meltzer's] email[s] was motivated by a discriminatory animus." Defs.' Br. at 14.[4] The Court agrees.

---

[4] Defendants also argue that "Meltzer [did] not deny [P]laintiff the position, [did] nothing to discourage [P]laintiff from applying, inform[ed] [P]laintiff of the general parameters of the position, and even instruct[ed]

10

Plaintiff argues in her Amended Complaint that her race was a motivating factor in Meltzer's effort to prevent her from joining the Search Committee. The evidence to which Plaintiff points is the signature line in Meltzer's first email regarding the committee, which he signed: "Howard aka Tom Sawyer (have fun painting the fence.....)." Am. Compl. at 17. According to Plaintiff, "[s]ome Tom Sawyer books were banned from American education because of controversial words and the phrase 'whitewashing the fence' refers to adverse attitudes against then [*sic*] people of color." *Id.* at 11.

Meltzer's references to Tom Sawyer and "painting the fence" do not support a plausible inference that Meltzer was motivated by Plaintiff's race. Meltzer alluded to Chapter II of Mark Twain's *Adventures of Tom Sawyer*, in which Tom gets his friends to paint a fence for him by convincing them that his chore is desirable. Rather than disparaging people of color, Meltzer's reference is colloquially understood to evoke an attempt to manipulate others to do a menial task that he did not want to do himself. *See, e.g.*, Tom Kuntz, *Oh, for a Chance to Whitewash a Fence*, N.Y. Times (Apr. 29, 2007), http://www.nytimes.com/2007/04/29/weekinreview/29basicA.html?_r=1 (collecting examples of Tom Sawyer's fence-painting escapade as a "metaphor of the digital age . . . to describe the Internet vogue du jour: exploiting free labor and content online").

As Plaintiff alleges no other evidence suggesting that Meltzer was motivated by her race in discussing the Search Committee, the Amended Complaint accordingly fails to "allege enough to 'nudge [Plaintiff's] claims across the line from conceivable to plausible.'" *Vega*, 801 F.3d at

---

[P]laintiff on how to apply." Defs.' Br. at 14. In making this argument, Defendants rely on the portion of Meltzer's February 19, 2013 email instructing Plaintiff on what to do "[i]f [she was] interested in applying for the job." Am. Compl. at 18. Although Meltzer's email is not entirely clear, it appears that he was telling Plaintiff how to apply for one of the HEO positions that the Search Committee sought to fill, not how to apply for the Search Committee itself. The Court need not resolve this issue, however, in light of its conclusion that the Amended Complaint fails to plausibly allege that Plaintiff's race was a motivating factor in Meltzer's conduct.

87 (quoting *Twombly*, 550 U.S. at 570).[5] Plaintiff's claims regarding the Search Committee are thus dismissed.

## B. Performance Evaluations and Termination

Plaintiff alleges that BMCC terminated her employment after she received negative teaching evaluations from Radell in April 2013 and Carr in November 2013. *See* Am. Compl. at 3. When compared to the more positive reviews she received from Haviland and Genova in prior years, she asserts, Radell and Carr's negative reviews must have been motivated by Plaintiff's race and sex. *See id.* at 19–27. Because Plaintiff has neither plausibly alleged that her race or sex were motivating factors in Radell and Carr's reviews nor that her employment was terminated because of those reviews, however, she has not pled a claim for relief under Title VII.

First, the Amended Complaint does not plausibly allege that Radell and Carr were—or that BMCC was—motivated by Plaintiff's race or sex either in giving Plaintiff poor performance reviews or in terminating her employment. The only possible connection alleged in the Amended Complaint that ties Radell and Carr's reviews to Plaintiff's race or sex is that, in other semesters, she received better reviews from Haviland and Genova. This allegation alone, however, does not nudge Plaintiff's claim of discrimination across the line from possibility to plausibility. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

---

[5] The Amended Complaint suggests that Meltzer's statement that "the Union frowns on having part-time faculty but [*sic*] in hours without being compensated" was pretext. Am. Comp. at 18. Plaintiff alleges that she "served as Union Member of New York State United Teachers . . . spending non[-]compensated hours in Albany, NY lobbying in 2012-2013 in productive volunteer positions." *Id.* at 11. This dispute is immaterial, however, because Plaintiff's union participation does not create a plausible inference that Meltzer was motivated by Plaintiff's race. Under the traditional burden-shifting analysis courts use to analyze Title VII claims, Plaintiff "must carry the initial burden under the statute of establishing a *prima facie* case of . . . discrimination" before the "burden . . . shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Littlejohn*, 795 F.3d at 307–11.

(quoting *Twombly*, 550 U.S. at 557)). Nor does Plaintiff allege any additional facts that could tie her subsequent termination to a discriminatory animus on the part of BMCC.

In any event, the Amended Complaint fails to allege that Plaintiff suffered any adverse employment action as a result of Radell and Carr's evaluations. "[A] negative performance review, without more, does not represent an adverse employment action." *Chung v. City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015) (citing *Fairbrother v. Morrison*, 412 F.3d 39, 56–57 (2d Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Negative evaluations can be adverse employment actions only if they give rise to material adverse changes in work conditions." *Hawana v. City of New York*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Vega*, 801 F.3d at 85 (quoting *Terry*, 336 F.3d at 138).

Plaintiff fails to allege that Radell and Carr's negative evaluations "g[a]ve rise" to her termination. *Hawana*, 230 F. Supp. 2d at 528. To the contrary, the Amended Complaint demonstrates that despite those reviews, BMCC continued to offer Plaintiff employment. After Radell evaluated Plaintiff during the spring semester of 2013, Plaintiff returned to BMCC to teach in the fall semester. *See* Am. Compl. at 25–27, 49–50. Similarly, after Carr evaluated Plaintiff during the fall semester of 2013, Plaintiff received a letter "offer[ing] [her] re-employment . . . for the Spring 2014 semester." *Id.* at 46. Plaintiff accepted BMCC's offer, which was "subject to sufficiency of enrollment, financial availability and curriculum need." *Id.* Although Plaintiff argues that BMCC "did not honor [this] contractual agreement," *id.* at 47, she alleges no facts suggesting that she was terminated because of Radell and Carr's evaluations and not because of

insufficient enrollment, finances, or curriculum needs. Nor does she attempt to explain why, had Defendants wanted to terminate her after Radell and Carr's evaluations, BMCC nonetheless offered to renew her contract. In light of these failures, Plaintiff has not plausibly alleged that her race or sex "was a motivating factor" in her termination. *Vega*, 801 F.3d at 86; *see Iqbal*, 556 U.S. at 682 (concluding inference of discrimination was implausible when an "obvious alternative explanation" existed (quoting *Twombly*, 550 U.S. at 567)).

Stripped of any connection to Plaintiff's termination, Radell and Carr's evaluations do not constitute adverse employment actions and Plaintiff alleges no other negative consequence flowing from them. Because they ultimately resulted in "no disciplinary action," they cannot support a Title VII claim standing alone. *Hiralall*, 2016 WL 1126530, at *10 (citing *Hawana*, 230 F. Supp. 2d at 528). Plaintiff's Title VII claims are therefore dismissed.

## II. Lily Ledbetter Act

Plaintiff seeks relief under the Lily Ledbetter Act because Defendants' "unfair labor practices and terms of conditions . . . caused [her] pay to decrease." Am. Compl. at 47. The Lily Ledbetter Act, however, "does not provide a separate theory of recovery, but instead establishes background rules for timing and damages in equal pay claims brought under other statutes." *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 n.2 (2d Cir. 2015) (citing 42 U.S.C. § 2000e–5(e)(3)).

Even if the Court were to construe Plaintiff's Lily Ledbetter Act claim as an equal pay claim brought pursuant to the Equal Pay Act, it would fail. "To prove discrimination under the Equal Pay Act, a plaintiff must show that: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" *Lavin-*

*McEleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001) (quoting *Belfi v. Pendergast*, 191 F.3d 129, 135 (2d Cir. 1999)). As the Amended Complaint does not allege any of these elements, Plaintiff's equal pay claim is dismissed.

### III. Sherman Act

The Amended Complaint also purports to bring a claim under § 1 of the Sherman Act because "Defendants violated and breached a contractual agreement," by which Plaintiff presumably means her employment contract with BMCC for the spring semester of 2014. Am. Compl. at 3. Although Plaintiff "acknowledges the Sherman Act originated for North American trade contracts," she maintains that it applies to "[e]very person who shall make any contract or engage in any combination or conspiracy, unfair or deceptive practice." *Id.*

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "To hold a defendant liable for violating § 1 of the Sherman Act, a district court must find 'a combination or some form of concerted action between at least two legally distinct economic entities' that 'constituted an unreasonable restraint of trade.'" *United States v. Apple, Inc.*, 791 F.3d 290, 313 (2d Cir. 2015) (quoting *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir. 1993)).

The Amended Complaint does not allege the existence of any "unreasonable restraint of trade," *id.*, let alone one "among the several States, or with foreign nations," 15 U.S.C. § 1. Nothing in Plaintiff's employment contract with BMCC restrained interstate commerce, nor did any action taken by Meltzer, Radell, or Carr. Plaintiff's Sherman Act claim must therefore be dismissed.

## CONCLUSION

As the Court has already given Plaintiff one opportunity to amend her pleading, Defendants' motion to dismiss the Amended Complaint is granted with prejudice. The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated: August 2, 2016
         New York, New York

_____
Ronnie Abrams
United States District Judge